**UNITED STATES v. HOLTZ et al.**

No. 22398–G.

District Court, N. D. California, S. D.
Jan. 10, 1944.

Frank H. Patton, Sp. Asst. to the Atty. Gen., for plaintiff.

Andrew F. Burke and Wayne M. Collins, both of San Francisco, Cal., for defendant Andreas Peter Jessen.

Casper A. Ornbaum and Everett ·H. Roan, both of San Francisco, Cal., for defendant Friedrich Wilhelm Kuehn.

Wayne M. Collins, of San Francisco, Cal., for defendant Johannes Frederick Bechtel.

Marshall Rutherford, of Oakland, Cal., for defendants Otto Fuerst and Kurt Max Frederick Nitz.

Henry B. Lister, of San Francisco, Cal., for defendants Fred Bernard Christophel, Herbert Landes, and Karl Theodor Stauts.

Allen & Schroth, of San Francisco, Cal., for defendant Paul Fix.

Joseph J. Bullock, of Redwood City, Cal., for defendants Louise Andermahr and Frank Joseph Andermahr.

Gottfried Karl Hein, in pro. per.

GOODMAN, District Judge.

Solely for the purpose of receiving evidence as to the principles and practices of the organization known as the German-American Bund, its predecessors and affiliates, all of the above entitled actions were consolidated for trial by order of this court heretofore entered with consent of all parties. Rule 42(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. By the order of consolidation there was reserved to each of the defendants the right to a separate trial on all other issues, save and except the common one for which consolidation was had. Each of the above actions was initiated under section 338 of the Nationality Act of 1940, 8 U.S.C.A. § 738, to cancel and revoke the certificates of naturalization of the several defendants on the ground of fraud and illegality in the procurement thereof. Section 338 of the Nationality Act 1940, 8 U.S.C.A. § 738. The complaint in each of the cases is substantially the same, except as to certain allegations individually applicable to the several defendants. The complaint alleges in substance the jurisdictional facts; that naturalization was procured fraudulently and illegally in that the defendant claimed. attachment to the principles of the Constitution of the United States and favorable disposition to the good order and happiness of the United States, whereas, said claim was false and attachment to the Constitution and favorable disposition to the good order and happiness of the United States were non-existent at the time of naturalization and were so known to the defendant; that the representation of intention to become a permanent citizen was false and known to the defendant to be

false; that the oath of allegiance to the United States and renunciation of allegiance and fidelity to any foreign prince, potentate, state or sovereign of whom or of which he had theretofore been a subject or citizen and particularly Germany was false and known to be false at the time by the defendant; that the oath to support and defend the Constitution and laws of the United States against all enemies foreign and domestic, and to bear true faith and allegiance to the United States was false and known to the defendant to be false; that the defendant's oath that he took his obligation freely and without any mental reservation or purpose of evasion was false and known to the defendant to be false.

The allegations of the complaint as to fraudulent and illegal procurement of citizenship were specifically denied in the answer, and, in addition the following special defenses were urged:

a. Lack of jurisdiction in the court to revoke citizenship.

b. Abatement of the action by lapse of time.

c. Res adjudicata in that the court decree granting citizenship fully and finally determined the question of citizenship and is not subject to collateral attack.

d. Section 338 of the Nationality Act is "ex post facto" and therefore not here invocable.

Certain of the defendants moved to dismiss on the above grounds and upon the further ground that the complaint failed to state a cause of action. Decision on these motions was reserved.

■ I am satisfied that the complaint states a cause of action. United States v. Kuhn, D. C., 49 F.Supp. 407.

■ The special defenses are without merit. The special defense of res adjudicata cannot be sustained inasmuch as the statute specifically authorizes this proceeding. Section 338 of the Nationality Act of 1940, 8 U.S.C.A. § 738. United States v. Dietz, D. C., 52 F.Supp. 201. The case of Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, is urged in support of the plea of res adjudicata. However, there the Supreme Court specifically failed to pass upon the res adjudicata point, but based its decision wholly upon the merits of the case before it.

■ Jurisdiction comes from § 338 of the Nationality Act of 1940, which duplicates the provisions of § 15 of the Act of June 29, 1906, 34 Stat. 596. Schneiderman v. United States, supra; Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; United States v. Ovens, 4 Cir., 13 F.2d 376; United States v. Plaistow, D.C., 189 F. 1006; United States v. Koopmans, D. C., 290 F. 545; United States v. Fox, D.C., 14 F.2d 242.

■ No doubt exists that the 1906 Act applied to certificates of naturalization issued prior thereto. Luria v. United States, supra; Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066. Since § 338 of the 1940 Act duplicates the provisions of the 1906 Act there is no merit in the so-called "ex post facto" contention. United States v. Dietz, supra. The motions to dismiss are severally denied.

The government contends that the defendants were members of the so-called German-American Bund or its predecessor organizations or affiliates, that the principles and practices of these organizations were un-American in character and that participation by the defendants in the principles and practices of these organizations, together with other acts on the part of the defendants, precluded good faith and legality in the taking of the oath of citizenship requisite for the issuance of citizenship certificates.

The evidence presented on the so-called consolidated issue as to the principles and practices of the German-American Bund, its predecessors and affiliates, discloses the following:

The seed that eventually developed into the German-American Bund was planted in the United States on October 12, 1924 by the witness Peter Gissibl and associates, young German immigrants, who had been members of the Nationalsozialistische Deutsche Arbeiterpartei (N.S.D.A.P.) in Germany, an organization then headed by Rossbach, who was subsequently liquidated in the so-called Blood Purge of 1934.

The "Free Society of Teutonia" organized in Chicago on October 12, 1924, purposed the furthering of the National Socialistic movement of Germany. In 1926 the name of the organization was changed to "National Socialist Society of Teutonia." The evidence showed that from and after

1924 many of the members of the organization retained their membership in the N.S. D.A.P., that the organization was patterned in form after the N.S.D.A.P. of Germany; that it received communications from the party in Germany; contributed to the German organization; made contributions to Hitler; had a uniformed group patterned after the Storm Troopers (Sturm Abteilung) and taught and followed the principles and practices of the N.S.D.A.P. The name of the organization was again changed in 1932 to the "Bund of the Friends of the Hitler Movement," and, shortly after the accession to power of Hitler, in January 1933, the name was again changed to "Friends of the New Germany." At that time the N.S.D.A.P. in America went out of existence. In 1936 a convention of the organization was held and by change of name it converted itself into the "German-American Bund" (Amerikadeutscher Volksbund). Thereafter only American citizens of German nationality were admitted to membership in the Bund, although it had an adjunct affiliate called the "Prospective Citizens' League" or Bund "Sympathizers" in which German Nationals, and particularly those on the way to becoming American citizens, were admitted. The German-American Bund continued its activities until December 1941, when shortly after the attack on Pearl Harbor, it was dissolved, i. e. it went through the motions of dissolution, but the government contends a substantial number of its former members continued their activities subrosa in German singing societies.

In addition to the witness Gissibl, who after participating in the founding organization in 1924, was treasurer of the National Socialist Society of Teutonia from 1931 to 1932 and from 1937 to 1938 was unit leader of the Chicago unit of the German-American Bund and from 1934 to 1938 was President of the Teutonia Publishing Company, which printed the official newspaper of the German-American Bund and from 1935 to 1938 was President of the German American Business League, an affiliate of the German-American Bund, the government presented the testimony of Severin Winterscheidt, a member of the "Stahlhelm" or steel helmet group, which was a part of the United German Societies, of which the witness was secretary in 1937. Winterscheidt was active in bringing about the amalgamation of the Stahlhelm and the Bund of the Friends of the

New Germany in 1933 and later in 1937 became the editor of the "Deutscher Weckruf und Beobachter", the official organ of the German-American Bund, by appointment of Fritz Kuhn, the national leader (Bundesfuhrer) of the German-American Bund. In general, the witness was the press agent and director of propaganda of the organization, obtaining material from Germany for use in America and in like manner forwarding material from America to Germany.

Another witness produced by the government, was William Luedtke, who after coming to America, in 1933 became a member of the "Volkischer Bund," an organization of "racially conscious German Americans" which later merged into the Friends of the New Germany. The witness in 1935 was employed by the "German American Business League" (D.K.V.) later became its secretary and in 1939 became the national secretary of the German-American Bund.

By these witnesses and by voluminous documentation produced in the course of their testimony, and corollary to the testimony of other witnesses, the government offered proof of the general purposes and practices of the German-American Bund, its predecessors and affiliates.

In addition, witnesses were produced, and records and documents offered in connection therewith, relating to the activities of the Friends of the New Germany, and the German-American Bund in the West Coast area, particularly, in Los Angeles, San Francisco and Oakland.

It is clear from the evidence, which is without substantial contradiction, that the founding organization of 1924 was brought to life for the purpose of the development in America and the teaching here of the principles and purposes of the National Socialistic movement of Germany. I cannot come to any other conclusion but that thereafter the successor organizations, culminating in the German American Bund, followed the same course. What the first organization did to further the accession to power in Germany of Hitler and the accomplishment there of the purposes of the National Socialist party, the later organizations carried on in order to fulfill here in America the aims of Hitlerism.

### Structure of the Bund.

In every essential aspect, the Friends of the New Germany and the German-Ameri-

can Bund were patterned structurally upon the leadership principle expressed by the N.S.D.A.P.

First—a National leader or Bundesfuhrer with absolute authority to appoint subordinates, local unit leaders, issue so-called Bund commands to be obeyed implicitly and without question, and even to perpetuate himself by the appointment of his successor, although the formality of appointing delegates to a Convention for the selection of the Bundesfuhrer was had. (The delegates to the convention appear to have been selected by the local unit leaders after communication with and. instructions from the National Bundesfuhrer.)

Second—A subsidiary organization under the Bundesfuhrer consisting of:

a. "Gau" or district leaders. (The United States was divided into three districts—"Gau Ost" "Gau Mittlewest" and "Gau West.")

b. Local leaders or "Ortsgruppenleiter" in charge of the local units, e. g. San Francisco, Los Angeles, Oakland, etc.

c. Cell leaders (Zellenleiter) a smaller group under the local leader.

d. Block leaders (Blockleiter)—still smaller groups, when necessary. (U.S. Ex: 4a.)

Third—The O. D. (Ordnungs Dienst) and its predecessor organization, the "Schutzstaffel," the so-called strong arm or uniformed group, the prototype of the Sturm Abteilung (S.A.) of the Nazi party, having the same functions and similarly garbed. In "National O. D. Command No. 1" (U.S. Ex. No. 11) Wilhelm Kunze, National O. D. Commander, on December 1, 1940, described the O. D. as the "effective fanatical nucleus" of the Bund.

Fourth—A Youth Movement for the education of American German youth in the ideology of the National Socialistic party, functioning in precise pattern after the Hitler Youth Movement. in Germany, with schools and camps.

Fifth—The "Organisatorischer Aufbau der Frauenschaft," the organizational structure of the women of the German-American Bund; also clothed in the same habiliments and of the same character as the similar organization of the Nazi party in Germany.

Sixth—Official newspapers and organs for the publishing and dissemination of the principles of the organization to its members and those of its affiliates. Here in America the Deutscher Weckruf und Beobachter (D.W.B.) and Deutsche Zeitung, like the Volkischer Beobachter of the Nazi party in Germany, its official organ there, presumed to be owned by Hitler.

Seventh—The Uschla—disciplinary court or committee within the Bund, having the power to expel members and having its counterpart in the German Nazi party organization.

Eighth—Further conforming to the structural organization of the Nazi party, there were as adjuncts in America, subsidiary organizations as follows:

German American Business League (Deutscher Konsum Verband.)

German American Commercial League (Deutscher Handlungsgehilfen Verband.)

German American Vocational League (Deutsch-Amerikanische Berufsgemeinschaft.)

German American Settlement League, Inc. (A. V. Siedlungs Bund, Inc.)

German American Labor Front (Deutsche Arbeits Front.)

The evidence showed that there existed in Germany, at all of the times during which the German-American Bund and its predecessors functioned, agencies active among the German Nationals living in foreign countries. The two German agencies which were active in the United States during this period were the Deutsches Ausland-Institut (D.A.I.) or German Foreign Institute of Stuttgart, Germany; and the Volksbund für das Deutschtum im Ausland (V.D.A.) of Berlin, an association for the protection and promotion of German life and culture abroad.

The officials of the German-American Bund and its predecessors maintained communication with the two German agencies above named and received propaganda material from them. Some of the leaders in America visited in Germany and made personal contacts with the D.A.I. and the V.D.A. and arrangements were made for the sending of groups of youths and others to Germany for instruction and enlightenment in matters of so-called culture and political thought. In addition speakers were sent to America by and on behalf of the D.A.I. and the V.D.A.

## The Leadership Principle.

It is beyond dispute that the cardinal principle of the Nazi ideology is that the Fuhrer, as leader, is the embodiment of the aspirations and aims of the Volk, i. e. the German people, and that unquestioned obedience must be given to him and to his orders and commands, which must be taken as always right. This leadership principle not only pervaded the entire structure of the Bund organization but was taught and recognized as the ideal and objective of the organization. The Charter of the San Francisco unit (Ortsgruppe No. 9) was granted by the National Bundesfuhrer under his individual signature and vested in the "Ortsgruppenleiter" of the San Francisco unit all of the power and authority conferred by the Charter. (U.S. Ex. No. 425.)

Applications for membership in the German-American Bund obligated applicants as follows:

"The purposes and aims of the Bund are known to me, and I obligate myself to support them to the best of my ability. I recognize the leadership principle, in accordance to which the Bund is being directed. I am of Aryan descent, free from Jewish or colored blood." (U.S. Ex. No. 29-B-1.)

The membership book issued members after election among other things provided: "When leaving the country the bearer must, according to regulations, announce his departure to the Unit Leader and submit a written resignation to the Bund Leadership." (U. S. Ex. No. 29-c).

From time to time Commands were issued by the National Bundesfuhrer (October 1936 to December 1941) numbered serially 1 to 50 and delivered to each of the local units of the Bund and by the unit leader, in turn, read to the local unit members. In passing, it may be mentioned, that members were advised as to their procedure under the Alien Registration Law, 8 U.S.C.A. § 451 et seq., 18 U. S.C.A. § 9 et seq., and both members and sympathizers were directed not to mention the Bund or the Prospective Citizens League in filling out the registration form required for aliens. Bund Command No. 37 commanded members: "* * * induction into military service is not justified, in as far as it concerns Bund members and the American Germans for in the Selective Service Law the citizenship rights of Bund members and the defenders of Germandom are unconstitutionally severed. Every man, if he can, will refuse to do military duty until this law and all other laws of the country or the states which confine the citizenship rights of Bund members are revoked." (U. S. Ex. No. 10a.)

Meetings of the members of the Bund, not open to the public, were in most cases conducted in the German language and official communications and Bund Commands, etc., were likewise read in the German language. At local unit meetings as well as national or convention meetings, the Swastika banner was displayed. Adolph Hitler, in Mein Kampf (the sale and reading of which was encouraged at local unit meetings) said, concerning the Swastika banner: "I, myself, after countless attempts had laid down the final form: a flag with a background of red cloth, having a white circle, and, in its center, a black swastika * * *. *As National Socialists we see our program in our flag.* In the red we see the social idea of the movement, in the white the nationalistic idea, and in the swastika the fight for the victory of Aryan man and at the same time for the victory of the idea of creative work, which in itself always was and always will be anti-Semitic."[1]

Witnesses testified that at meetings, members gave the extended arm salute accompanied by the words "Heil Hitler". It cannot be disputed that this salute and salutation implied allegiance to Hitler, the Fuhrer. "The Horst Wessel" song, as well as "Deutschland uber Alles," the German national anthem, were sung at both public and private meetings of the units. Banners containing the slogan "Ein Volk, ein Reich, ein Fuhrer" or "One people, one state and one leader," were prominently displayed in the meeting places of the Bund units.

The Ordnungs Dienst (O.D.) was uniformed in exact simulation of the Sturm Abteilung (S.A.) of the Nazi party.

It is crystal clear that the emblems, slogans, salutes, and flags, so used, typified and symbolized the pledge of allegiance on the part of Bund members to the leadership, or Fuhrer, principle. The rules and regulations for the officers and members of

---

[1] Adolph Hitler, Mein Kampf (Munich, Verlat Franz Eher, 1933) pages 556, 557. (U. S. Ex. 395).

the German-American Bund (U. S. Ex. No. 4a) specify that: "It is the task of the national leader to maintain and to extend the German-American Bund as an offensive and defensive movement of a nationally conscious German American people, who are national-socialistically and constitutionally dedicated to the service of an actually independent, Aryan-governed United States of America."

The organizational structure made provision for a "Political Director" whose duties were prescribed as follows: "The guidance of the party policy of the movement, the promotion of the nomination of candidates for office by the entire German element, coordination in voting in elections, and the establishment of connections with leaders representing party policy and with incumbents of official posts for the purpose of creating nationalistic, Aryan-American politics." (U. S. Ex. No. 4a, p. 66.)

In a pamphlet written by Fritz Gissibl, "Mittlewest Gauleiter" of the Bund, and distributed to its members (U. S. Ex. No. 209), it was stated: "The primary goal of our Bund * * * is to transmit this philosophy (i e. National Socialism) (whose practical effects have been revealed to us in recent years so marvelously by the events in the Fatherland) to our Folk Comrades in America, and to demonstrate it in our actions."

### The Blood or Racial Supremacy Principle.

It was convincingly demonstrated in the record that National Socialism in Germany preached and based its very existence upon the doctrine that German blood is supreme and that, irrespective of nationality, any one of German blood remains a German and is bound by the ties of blood forever to be a German irrespective of the country of his residence or citizenship.

Said Friedrich Lange in Volksdeutsche Kartenskizzen: "blood is stronger than a passport. We will never call German people who are citizens of foreign countries aliens but racial comrades."[2]

Said Dr. Hans Steinacher, Director of the League for Germandom Abroad: "We feel and we also know that the

bonds of Volkstum has an infinitely deeper effect than the alienable possession of citizenship papers."[3]

From the evidence, I find that this blood supremacy doctrine was glorified in addresses, preachments and commands of the Bund leaders. Quotations from the preachments of Hitler in *Mein Kampf* were frequently made by Bund leaders. That the Bund taught the blood supremacy doctrine and made it a part of its ritual in the local units is proved in the record. At the very start the incoming member represented that he was "of Aryan descent, free from Jewish or colored blood." (U. S. Ex. No. 29-B-1.)

It would unduly lengthen this opinion to quote at length from speeches, commands, records of meetings and catalogues of the Bund, wherein the blood supremacy doctrine was extolled along with bitter and vitriolic denunciations of American citizens of Jewish or Negro extraction. Witnesses testified that at meetings of the local unit in San Francisco and Oakland they heard speeches and exhortations by members and officers of the local units, decrying against Jews and Negroes, and urging that they be purged from all participation in the economic and political life of the United States.

The basic concept upon which the Constitution of the United States was set, is found in the holding of the Declaration of Independence that "Life, Liberty and the pursuit of Happiness" are unalienable rights. By the Fifteenth Amendment, the right to vote was declared to be undeniable because of race, color or previous condition of servitude.

It follows therefore that belief in and practice of a doctrine aimed at the abridgement of the status of American citizens, because of race or color, is absolutely incompatible with allegiance to the Constitution of the United States.

▪ The Bund taught this incompatible doctrine. To the extent that any defendant subscribed to or believed in such a doctrine at the time of taking the oath of citizenship, such oath and the allegiance pledge could not be in good faith, ergo, such citizenship was illegally procured.

In cross examination of Gissibl, Luedtke, Winterscheidt and Punjar, defend-

---

[2] The German Reich and Americans of German Origin. (N. Y. Oxford University Press, 1938) p. 20.

[3] The Book of German Volkstum (Leipzig, 1935) p. 416.

ants sought to impeach their testimony on the ground that these witnesses were of bad moral character or had been convicted or charged with felony, etc. However their testimony as to the nature and purposes and practices of the Bund organizations was so fully and substantially corroborated by documentation and by the testimony of other more reputable witnesses, that despite their lack of good moral character, their testimony as to the facts is at least enlightening, if not persuasive. Furthermore it may be pertinently commented that several witnesses who testified as to the principles and practices of the Bund resigned and left the organization, after becoming dissatisfied with and unsympathetic to the purposes and practices thereof. It is not in favor of the organization that many of its leaders were of bad moral character and that others departed from its midst upon becoming more fully acquainted with its objectives.

■ Denaturalization, upon the ground of fraud or illegal procurement, pursuant to the statute, requires a probing of the state of mind of each defendant at the time the oath of citizenship was taken.

The court should not consider trifles in appraising the defendant's state of mind; nor should a natural sympathy for the country of origin and cherished memories thereof be magnified into divided allegiance or disloyalty.

The complaint charges falsification of the fundamentals when the oath was taken, i. e. attachment, allegiance, renunciation of allegiance to Germany.

■ It is now settled that the proof required of the government to accomplish denaturalization must be more than preponderant—it must be clear and convincing. Schneiderman v. United States, supra.

"For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized man. This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof." Schnei-

derman v. United States, supra, 318 U.S. page 122, 63 S.Ct. page 1335, 87 L.Ed. 1796.

■ Obviously statements and acts of the defendants prior to naturalization are admissible to show state of mind at the time of taking the oath. Likewise, it is now well settled that statements and actions subsequent to acquisition of citizenship, are admissible to prove state of mind and the purposes of seeking citizenship. Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182; United States v. Kuhn, D.C., 49 F.Supp. 407, and cases there cited.

It is argued by defendants that, under the authority of Schneiderman v. United States, supra, membership in the German-American Bund or its predecessor organizations or participation in their practices, is not proof of illegal procurement of citizenship. However, what was before the Supreme Court in the Schneiderman case was membership in the Communist Party of the United States and Young Workers League, its predecessor. The court analyzed the principles and purposes of the League and Communist Party and held that such aims and purposes (held to be idealistic and within the framework of the Constitution) to the extent that Schneiderman participated therein, were not of such a nature as to prove illegal procurement of citizenship by the petitioner (i. e. Schneiderman.)

The principles and purposes of the German-American Bund and its predecessors, as has been pointed out, were of a different character entirely. Idealistic theories of government and sociology were conspicuous by their absence. Allegiance to the Fuhrer (Hitler), blood supremacy, liquidation of Jews and Negroes were not ideals, but programs—viciously at variance with the principles of the Constitution and the Bill of Rights. Allegiance to the Fuhrer and to the leadership and blood doctrine implied and convincingly connoted allegiance to the Fatherland (the Reich).

■ In expressing the view of the court in the Schneiderman case, Mr. Justice Murphy pointed out: "Our concern is with what Congress meant to be the extent of the area of *allowable thought* under the statute." (Emphasis supplied.) The holding of the court was, in effect, that belief in the principles of the Communist Party

was within the permissible area of thought. I hold that belief in and adherence to the vicious principles of Naziism is *not* within "the area of allowable thought."

Hence Schneiderman v. United States does not guide us except as to the rules governing denaturalization proceedings and the character and degree of proof required. The facts there are not the facts here.

■ It is my conclusion that the aims, purposes and practices of the German-American Bund, its predecessors and affiliates, were clearly un-American. Evidence that any defendant substantially participated in the practices thereof may therefore be taken into account in determining the issue of denaturalization. However, the facts concerning the membership and participation of each of the several defendants in the Bund, its predecessors and affiliates, must be carefully examined and only upon that basis, plus other pertinent circumstances, can decision be justly made with respect to each of the defendants.

Subsequent to the order of consolidation, each of the twenty-eight cases was given a trial date—all being spread out over a period of several months.

At intervals between the time fixed for the first and last trial, the government, with the court's approval, dismissed sixteen of the cases. Twelve of the cases were tried to the court and submitted. I now proceed to consider each of the twelve cases.

Andreas Peter Jessen, No. 22516.

■ This defendant was born in 1898 in Hagenberg, Germany, and attended military school there. In 1914, the defendant joined the German army and served therein until June 1919, when, then a lieutenant, he was discharged. In October of 1919 he entered the University of Kiel and graduated in September 1920. He then went to North Schleswig, Denmark, and in March 1920 automatically became a citizen of Denmark, as a result of the Plebiscite held there, pursuant to the treaty of Versailles. In 1921 and 1922 he attended the Danish University of Agriculture. He arrived in the United States in February 1923 and immediately proceeded to California, where he has resided ever since. In 1925 he married a German woman and has two sons, the result of this union.

Defendant's declaration of intention was filed in San Francisco on September 17, 1923, his petition for naturalization was filed July 19, 1928 and he was admitted to citizenship on November 7, 1928.

He joined the German American Bund in July 1936 and was the "Ortsgruppenleiter" of the Concord unit from July 1936 to January 1937. Thereafter he became a member of the San Francisco unit of the Bund and remained a member until about February 1939. There is no evidence as to defendant's activities after 1939, except that during the last half of the year 1941, he was chairman of the local branch of the "Kyffhauser Kriegshilfswerk" and solicited and received funds from the German element in San Francisco, which he forwarded to the organization in Philadelphia; the evidence shows that the defendant knew that at that time at least a portion of the funds collected was being sent to Germany.

During the period from 1936 to 1939, defendant was active in the affairs of the German American Bund. He took part in the activities of the uniformed group, wore the uniform, attended meetings, made speeches frequently and during all of this period of time, collected and had at his home a large library containing publications and data concerning National Socialism, Nazi propaganda printed both in Germany and in the United States and anti-Semitic literature, the constitution of the Bund, song books of the Friends of the New Germany, copies of addresses delivered by Bund leaders, copies of speeches prepared by the defendant, "Mein Kampf," copies of the official newspaper of the Bund and other similar material. Defendant testified that he did not become aware of the "leadership principle" and "blood doctrine" until five or six months after he joined the organization and that he did not learn until sometime in 1937 that applicants for membership in the Bund were required to be Aryan and free of Jewish or Negro blood.

It would unduly lengthen this memorandum to quote from the many speeches given and papers written by the defendant. Suffice it to say that I am convinced beyond a reasonable doubt that at least from and after his joining the Bund he not only was fully aware of the anti-American and dis-

loyal nature of the preachings of National Socialism and of the Bund, but that he participated fully therein and wholly believed in the leadership principle and in the blood doctrine, that he was devoted to Adolph Hitler and that he did not, in fact at all, have any real faith in and allegiance to the United States. His explanations on the witness stand were completely unconvincing and obviously were founded in afterthoughts.

The question presented in the case of this defendant is whether or not the facts establish beyond a reasonable doubt, via the doctrine of "relation back," that at the time of his naturalization, to-wit, in November 7, 1928, over seven years before he became a member of the Bund, he did not take a true oath of allegiance to the United States. The statements and conduct of this defendant during the years commencing with and following 1936 are, under the authorities before mentioned, competent evidence of his state of mind at the time of naturalization. Do they in this case, beyond a reasonable doubt, prove fraud at the moment of acquisition of citizenship?

This defendant was well educated in Germany and served with distinction in the armed forces of his native country. He therefore may be said to have had a thorough military indoctrination of the German type, with the strict regimentation implied thereby. In the year following his arrival in the United States, the "Free Society of Teutonia" was founded in Chicago; two years later it became the "National Socialist Society of Teutonia," followed in 1932 by the "bund of the Friends of the Hitler Movement," and in 1933, after the accession of Hitler to power, by the "Friends of the New Germany."

When he took the oath in 1928, did the defendant have mental reservations as to his allegiance to the United States? Shall the court believe that when defendant first openly espoused National Socialistic principles, upon joining the Bund in 1936, he suddenly changed his viewpoint toward the United States and the Constitution? Can the court assume that he, a former German Army Officer, gave full allegiance to the United States from 1928 to 1936 and then suddenly became converted to the doctrines of Hitlerism and National Socialism? I am persuaded by the reasoning of the court in United States v. Schlotfeldt, 7 Cir., 136 F.2d 935, that the passage of time between naturalization and acts and statements of disloyalty does not *ipso facto* negative the effect of the evidence respecting such statements and acts, but that, on the other hand, it is persuasive of a long existing intent and purpose of mental reservation as to loyalty, springing into actuality at the appropriate time. The embers were always glowing and sprang into flame when stirred by the hand of opportunity. I have no doubt that this defendant never was a loyal citizen of the United States and that when he took the oath he mentally reserved allegiance to Germany. Schurmann v. United States, 9 Cir., 264 F. 917; United States v. Kuhn, D.C., 49 F.Supp. 407; United States v. Wursterbarth, D.C., 249 F. 908; United States v. Schlotfeldt, supra.

It is inconceivable, as I view this case, that an applicant for citizenship, who loyally takes the oath of allegiance, could possibly preach the doctrines that this defendant preached, unless he had mental reservations at the time he took the oath of allegiance.

Judgment will go for the government in this case.

### Fred Kuehn, No. 22507.

 This defendant was born in Klink, Germany, in 1901. He received the equivalent of our high school education there and came to the United States on or about the month of December 1922 and has continuously resided in this country since.

Defendant claims that he first filed a declaration of intention to become a citizen in 1928 in Santa Rosa, County of Sonoma, State of California; he claims that this declaration was mislaid in the clerk's office and that he again filed a declaration in 1933.

The records show that the declaration of intention was filed on November 19, 1931; that petition for citizenship was filed on February 7, 1935, and that defendant was admitted to citizenship in the Superior Court of the State of California, in and for the County of Sonoma, on May 16, 1935.

Defendant testified that he became a member of the "Friends of the New Germany" in June 1935, being "drafted" by a small group in Santa Rosa as spokesman or head of the local unit there organized. He stated that he was not the leader ("Ortsgruppenleiter.") The record book of the organization indicates that he paid dues and was treated as a member from and after April 22, 1935. The evidence shows

that prior to the date of his naturalization he made a trip to Los Angeles and there had a meeting with Herman Schwinn, the district leader of the organization, and that there the formation of the Santa Rosa unit was planned. Defendant testified that he was not a member of the organization after January of 1939, but as late as May 1939 he wrote to Schwinn, the district leader, on the letterhead of "Amerikadeutscher Volks-bund Freunde des Neuen Deutschland" (in the meantime "Friends of the New Germany" had become the German-American Bund), whom he addressed as "Lieber Freunde und Gauleiter," in which he stated: "If you don't do something soon to hold San Francisco, then forget about all Local Groups north of Los Angeles. If you can't come yourself, then at least send somebody else, because there is still a lot of good material in S. F. which can perhaps still be held. I hope I may hear from you again, even though you do not count Peta-luma except as an emergency."

The testimony showed that the defendant attended meetings of the Bund both in Santa Rosa and in San Francisco, wore the uniform of the O. D. and had his picture taken along with other members of the uniformed group. He arranged for a reception in Petaluma on June 29, 1938 for Herman Schwinn, prepared the notice of the meeting and among other things stated in the notice: "The Aryan Bookstore will also be present." Although very vague and non-communicative when questioned by the court concerning what the Aryan Bookstore was, there is no doubt, that it consisted of the propaganda and material used to disseminate the teachings of the Bund. He addressed the American Legion in San Francisco on the purposes of the German-American Bund in 1938 and in that speech claimed that the main purpose of the Bund was to fight communism. In his speech he said: "We desire and intend to attain the friendship of all patriotic American organizations, determined with us to maintain or reconstitute these our United States, a sovereign and independent, morally and ethically clean, socially just and God-fearing nation, and hence the uncompromising enemies of international, atheistic, Jewish Marxism in all its guises and disguises.—Let white people run this country, as they did before this jewish invasion."

At his home in Petaluma, the swastika flag was prominently displayed as well as a picture of Hitler. He wore a swastika ring. This, together with his O. D. uniform, he destroyed as soon as he learned of the start of the investigation of the Bureau of Investigation. His former mother-in-law and former sister-in-law testified that in July of 1937, he kissed Hitler's picture in their presence and said: "this is my God" and rubbed the American flag on the seat of his trousers and said to his then wife: "this is your government."

Defendant was subsequently divorced and has now remarried.

One witness testified to have seen the defendant give the Nazi salute while in O. D. uniform and say "Seig Heil" and that the defendant had given him anti-Jewish literature.

It is clear to me that the mother-in-law and the defendant were not on friendly terms and some doubt as to the credibility of her testimony may exist. However, the sister-in-law's testimony upon the same subject appears to be truthful.

Defendant on the other hand denied the statements attributed to him; claimed that he knew nothing of the "leadership principle" of the Bund or of the "blood doctrine," that the organization was only social in character and that he did not subscribe to or believe in the leadership principle or blood doctrine or any of the other principles of National Socialism; that he had always been a loyal citizen and would fight for the United States, although he would prefer to fight against Japan, than against Germany, but would fight against Germany if called upon to do so.

Several witnesses testified as to his good character and reputation in the community. However, one of the witnesses, who was one of his sponsors for citizenship, stated that, had he known defendant was a member of the Bund, he would not have witnessed his naturalization application.

Defendant made an unfavorable impression upon the court while on the witness stand, was evasive in his answers and I do not believe, in view of all of the evidence, his statements that he was not aware of and did not subscribe to the "leadership principle" or the "blood doctrine" or the anti-Jewish preachments. If there were the slightest doubt in my mind, I would resolve it in his favor because of the requirement that the government's case must be proved beyond a reasonable doubt by the most convincing testimony. I am satis-

fied that at the time he took the oath of allegiance, he mentally reserved allegiance to Germany and to the principles of National Socialism and that he believed in these doctrines during the period of his membership in the "Friends of the New Germany" and the Bund.

The government sustained its burden by proving that the defendant's conduct and expressions in the years following naturalization were opposed to the principles of the Constitution. Such conduct and expressions constitute proper evidence to prove fraud in taking the oath of allegiance. The long line of cases sustaining that doctrine was not overruled in Schneiderman v. United States, supra; United States v. Schlotfeldt, 7 Cir., 136 F.2d 935.

Judgment will therefore go in favor of the government in this case.

Fred Bernard Christophel, No. 22552.

Defendant, Fred Bernard Christophel, was born in Neustadt, Germany, in 1902. His father was a boilermaker and his mother, a housewife. He had a common school education in Germany and received no military training of any kind there. After his schooling was completed, he followed the trade of a baker. In 1923 he married in Germany and one son, Ludwig, was the offspring of the marriage, in August of 1924.

With his wife and child he left Germany and arrived in the United States in April of 1926 and came to San Francisco, California, where he has resided ever since, following his trade as a baker.

Declaration of intention to become a citizen was filed in 1926 shortly after his arrival in the United States; petition for citizenship was filed May 9, 1933 and defendant was admitted to citizenship in this court on September 11, 1933.

Prior to his naturalization, he had become a member of the Hermann Sons, an innocuous fraternal order of long standing.

The evidence shows that he became a member of the "Friends of the New Germany" in San Francisco, on or about November 1933; that subsequently he became a member of and participated in the Ordnungs Dienst, the uniformed group; he remained a member of the "Friends of the New Germany" until the latter part of 1935 at which time he discontinued active participation in the organization and in the O. D. although it is not disputed by the defendant that from time to time he attended meetings thereafter, and also meetings of the German-American Bund irregularly up to the years 1938, 1939. He admitted that he wore the uniform of the O. D. on various occasions with the swastika arm band; that he gave the Nazi salute and said "Heil Hitler" on various occasions; had his picture taken with the uniformed group and with groups of the "Friends of the New Germany", that he attended meetings of the German Vocational League, entertained German sailors on leave from German ships, while in San Francisco harbor, that he had in his possession pictures of Hitler, listened to speeches by some of the officers of the organization on the subject of the "leadership principle" and "blood doctrine," that at the time he believed that National Socialism was good for Germany and that Hitler was doing a good job for the German people, that he had read part of *Mein Kampf* and some of the German newspapers and Magazines distributed at meetings of the "Friends of the New Germany." He denied however that he believed in or advocated National Socialism or any of the Hitlerian doctrines for this country; he admitted that Hitler's policy of liquidation of the Jews in Germany was proper in Germany but denied that he ever advocated or believed in such a policy for the United States. He testified that he urged his son, Ludwig, to enlist in the armed forces of the United States before he was eighteen years of age and that his son tried to enlist in several branches of the service but was rejected because of his alienage. The son was finally selected for service under the Selective Service Act and is now and has been serving for approximately one year in the Army Air Corps.

The sum total of the evidence is that the defendant during the years 1934 and 1935 was an active member of the "Friends of the New Germany" and the O. D. No evidence was presented as to any specific acts or statements on his part, outside of or in addition to the fact of membership and participation in the activities of the two organizations named.

The evidence is neither clear nor convincing that the defendant had any mental

reservations as to allegiance and loyalty at the time of taking the oath of citizenship.

He impressed me, and my questions developed, that he is a simple man, who served in a more or less menial and unimportant capacity in the activities of the "Friends of the New Germany" and the O. D., that he never gave very much thought, if any, to the questions of the so-called "leadership principle" or "blood doctrine," and it is doubtful whether his education and knowledge was sufficient for him to adequately comprehend them. He stated he was happy in his American citizenship. He appeared to be very proud to have his son in the armed forces of the United States and stated that he, himself, was willing to serve, if called upon, in the armed forces and fight against Germany.

I am satisfied that adequate grounds have not been presented for cancellation of citizenship and accordingly judgment in this case will go for the defendant and against plaintiff.

### Herbert Landes, No. 22409.

This defendant was born at Naumburg, Germany, in the year 1909. His father, a musician, was killed in the first World War; his mother, on her government pension, raised the defendant and three other children. Defendant had a common school education, and, at the age of fourteen years immigrated to the United States, arriving here on December 7, 1923. He immediately came to San Francisco, where he was taken in charge by his uncle, one T. Kniesche, who was then operating a restaurant in San Francisco. He had some part time high school education, and then went to work as a cook for his uncle and continued as such until excluded from this area by army order after the outbreak of war with Germany. One of his sisters immigrated to the United States about five years after his arrival here and the remaining brother and sister are still in Germany. Defendant's mother is now deceased. Defendant had no military training of any kind, either in Germany or the United States. His declaration of intention to become a citizen was filed on November 18, 1927, in this court; his petition for citizenship was filed April 2, 1930; his admission to citizenship was on August 4, 1930. Defendant became a member of the "Friends of the New Germany" in June of 1935 and was active in the affairs of this organization and of its successor, the German-American Bund, up to and including the year 1939 and thereafter, and almost up to the time of Pearl Harbor, sporadically engaged in activities of the Bund. He became a member of the O. D. in October or November of 1935 and participated in the work of this uniformed group up through a good part of the year 1941. In 1936 he returned to Germany on what he claimed was a social visit to see his mother and remained there about eight months, returning to the United States in 1937. The records of the Bund and the O. D. show that he was a regular attendant at meetings, wore the uniform of the O. D., attended both public and private meetings of the Bund, and even participated in meetings of the inner circle of officers of the Bund. He helped to arrange for and attended celebrations, held under the auspices of the Bund, commemorating the Beer Hall Putsch and Hitler's birthday, made several trips to Los Angeles in connection with Bund matters, conferring there with Schwinn, the Los Angeles Ortsgruppenleiter, making one of the trips in company with Gottfried Hein, local unit leader, now in a Federal·Penitentiary having been convicted of violating the Selective Service Act. His testimony further showed that he was a friend of Hein and that the two collaborated in connection with Bund affairs. The evidence showed that he was present at meetings when the Bund commands were read, that he was familiar with and understood the form of the organization of the Bund, that he purchased propaganda pamphlets published in Germany, having put his name on a list for that purpose, that he was present at meetings at which the National Bundesfuhrer appeared in San Francisco. When he was in Germany in 1936, he attempted to get work there but claims he was unable to do so because of his American citizenship. He arranged for meetings of the Bund at private halls and residences, was present at meetings at which George Baker, Father Coughlan's representative, spoke, and contributed to the fund for the defense of Fritz Kuhn. He admitted that he destroyed the membership list of the Bund shortly before Pearl Harbor, after consulting with Hein.

James P. Smith, immigration inspector, stated that in 1933 or 1934, defendant said

to him that he thought "Hitler would be a damned good man in this country, here to change conditions and get rid of the god damn Jews and that they needed somebody over here to shake them up." The witness stated that he was not sure of the date of this statement by defendant, but that it could have been any time in 1932, 1933 or 1934.

Ernest Heide, defendant's brother-in-law, with whom defendant lived for several years before defendant's marriage, testified that he had disagreements with his brother-in-law on several occasions concerning the Bund and its purposes, defendant contending that the Bund was a good thing and that all German Americans should belong to it, that Hitler had done great things for Germany and it would be a good thing for this country to have Hitler's ideas here. The witness Heide disagreed with these ideas on the ground that he felt that the defendant was not doing the right thing as an American citizen.

There is no doubt in my mind that from and after the year 1935, the defendant was not bearing true faith and allegiance to the United States; that his true faith was, during that time, to Germany; that he believed in the Hitlerian doctrines and that he was endeavoring to promote them in this country. Were there a statute providing for denaturalization for such reasons, I would have no hesitancy in finding the defendant undesirable and unfit for citizenship.

However, the question presented in this case is whether or not the evidence, which I have briefly summarized, is sufficient under the authorities before referred to, to show a state of mind and mental reservations amounting to fraud in 1930, at the time defendant acquired American citizenship.

It must be remembered that the defendant arrived in the United States in 1923, at a time when he was of school boy age— fourteen years old. He had had no military training in Germany. It would be utterly unfair to assume that at such an immature age he had absorbed at all, or had any understanding of such philosophies as National Socialism, then in the throes of birth, or kindred doctrines. After arriving in this country, and while still in the custody of his uncle, he had some fragmentary part time high school education and then worked for his uncle as a cook. In 1927 and while

he was still a lad of approximately eighteen years, he filed his declaration of intention to become a citizen; followed it up with his petition for citizenship in 1930 and in the same year, when he was twenty-one years of age, took the oath. With such a background, I cannot believe, nor am I at all persuaded, that at the time he took the oath of allegiance, he had any mental reservations as to his oath of allegiance. Were there anything in his personal history prior to naturalization to warrant it, then his acts and conduct from 1935 on, could reasonably be related back to show a disloyal state of mind at the time of naturalization. This I have found to be the case with some of the other defendants, where the doctrine of "relation back" has a basis for application.

In this case, I believe that the defendant might have become a good American citizen had he not fallen in with companions interested in promoting the purposes of the "Friends of the New Germany" and the Bund. It was the result of such associations and companionship, and not the flaming into activity of latent beliefs in his mind at the time of naturalization, that brought about his pernicious activities.

I hold no brief for this defendant. He was neither cooperative nor frank, when on the witness stand. He unsuccessfully endeavored to belittle his activities in the Bund. He professed ignorance of matters which he clearly understood. For this the Court cannot denaturalize him.

In the respects which I have stated, this case is differentiated from the cases of Jessen, Kuehn and Hein.

Judgment will go for defendant.

### Otto Fuerst, No. 22515.

Defendant was born in Delmensingen, Germany, February 21, 1904. His father was an electrical engineer and defendant received a common school education and then served an apprenticeship as a landscape gardener. A younger brother worked for the father in the electrical business. After serving his apprenticeship as a landscape gardener, defendant was employed by several German firms. His final employment was on behalf of the German government at the German Embassy in Rome where he worked as a gardener for two years. From Italy, after a brief visit to his home in Germany, he came to the United States arriving here in 1930, at

which time he was not quite twenty-five years of age. He had no military service in Germany. After arriving in this country he worked as a landscape gardener, finally acquiring his own business in 1933. From that time on he hired himself out as an independent contractor to various persons and institutions as a landscape gardener.

His declaration of intention was filed on July 1, 1932, petition for naturalization was filed March 17, 1937 and on July 2, 1937 he was admitted to citizenship in the Superior Court of the State of California, in and for the County of Alameda.

Defendant has been a resident of the San Francisco Bay area since January 1930, until excluded by army order, after the declaration of war against Germany.

Defendant testified that he joined the German-American Bund in September of 1937. In a written statement given to agents of the Bureau of Investigation in Chicago, Illinois, on March 1, 1943 (U.S. Ex. No. 2.) defendant stated that he joined the Bund in July of 1937. He testified he resigned in June of 1938. During his period of membership in the Bund, he played the zither in an orchestra which furnished music at so-called social meetings. The members of this orchestra wore a garb somewhat similar to the uniform of the O. D. and the evidence shows that defendant also wore the garb or uniform of the O. D. on a number of occasions. At the time the defendant was a member of the Oakland unit of the Bund, Gottfried Hein was the Ortsgruppenleiter thereof.

Defendant testified that he had met Hein before joining the Bund and attended meetings at which Hein was present, before he became a member. Defendant attended meetings of the Bund at which Fritz Kuhn, the National Bundesfuhrer spoke; he read part of Mein Kampf and also some of the literature offered for distribution at the so-called propaganda table in the Bund hall; attended the celebration of Hitler's birthday in 1938, where those present toasted Hitler and said "Heil Hitler;" he signed the printed application for membership (U. S. Ex. 29–B–1) and knew the requirements for membership; he stated that he resigned because, in effect, he did not like discussions of politics and the "talk that was used" in the Bund.

The evidence showed that from reading "Wechruf and Beobachter" and other literature and from discussions with Hein and others, defendant acquired some knowledge of the purposes and objects of the organization.

Witnesses testified to the following statements having been made by the defendant:

In 1939, he stated that other nations could learn from Hitler and Germany to their advantage; that the Nazi form of government was good for Germany and that he admired Hitler's government and also that he admired Hitler; that the people in Germany paid less taxes under Hitler than did American citizens.

Several witnesses testified that the defendant was present at the tenth wedding anniversary of the Bechtels, one of whom is a defendant in denaturalization proceedings and that the swastika flag was prominently displayed there.

One witness, a hat checkroom attendant, testified that at the meeting place of the Bund, she saw the defendant in the O. D. uniform several times during the years 1936 and 1937, and that on one occasion defendant and Hein offered to pay her dues for her if she would join the organization and on that occasion Hein stated in the presence of the defendant that the Bund would be the ruling power in this country eventually and that those who joined in the early stages would get the best jobs when the new government instituted by the Bund came into power and that the Jews would be driven out of America.

Another witness testified that at the boarding house where the defendant and others lived during the years 1936 and 1937, when Hitler was likened to Charlie Chaplin, the comedian, the defendant lost his temper, pounded on the table and left the room.

Another witness, who was the owner of the nursery, which he subsequently sold to the defendant in 1933, testified that on one occasion he had warned the defendant not to talk about Hitler and Germany, as it was disturbing and provocative of arguments.

It appears in this case that the defendant did not join the Bund until July 1937 at the earliest. There is, however, some evidence that he attended meetings of the Bund and became interested in its activities in the year 1936. Here we have a case of membership in or interest in the Bund organization at or about the time of naturalization. Statements made by witnesses indicate defendant's feelings about Hitler and Germany at or about the time of nat-

uralization and subsequent thereto. Added to this is the fact that the defendant resigned in June of 1938, because according to his own statements he did not like the "talk that was used." When pressed by the court as to what "talk" was meant, his explanation was not clear. He did not specifically answer the court's questions in that regard, although he did say that it was just the fact that he did not care generally about hearing talk about politics and other matters and that he severed his connection with the organization. The period of interest in and membership in the Bund organization was comparatively short and there is no evidence of any substantial character to indicate state of mind during the period subsequent to resignation from the Bund.

The evidence in this case does not, in my opinion, measure up to the prescribed standard.

Accordingly judgment will go for defendant.

Kurt Max Frederick Nitz, No. 22519.

 Defendant was born on November 1, 1906, in Buetow, in Pom, Germany, the son of a farmer. He came to the United States in 1925, at which time he was nineteen years of age. He first made his home in Cleveland, Ohio, where he lived with a married sister, who had previously emigrated from Germany, until 1933 and then came to California. He has since been a resident of the Northern District of California, until excluded by army order subsequent to the declaration of war with Germany.

His declaration of intention to become a citizen was filed on May 7, 1926 in the United States District Court for the Northern District of Ohio. His petition for naturalization was filed on October 12, 1931 in Ohio and he was admitted to citizenship there on January 22, 1932.

In Germany he had a common school education and three years of high school, and no military training. The defendant learned the machinist trade before coming to the United States and followed the same trade in this country.

The evidence showed that the defendant has never been a member of the "Friends of the New Germany" or of the "German-American Bund." He did attend a few social affairs of the Bund, including the much-referred to Dublin Canyon picnic.

During the period from June of 1937 until January of 1940 defendant was employed as a machinist at the Frieden Calculating Machine Company in San Leandro. The government presented the testimony of several of his fellow employees. The gist of the testimony of these witnesses was that defendant had made statements indicating that he was in favor of the Hitler government in Germany; that he approved of the way that Hitler was "handling things; that the Jews were getting what they deserved at the hands of Hitler and that maybe it would be a good idea to have Hitler here to "clean up" affairs in America. It appeared, however, that defendant was one of a small group of employees working in an experimental shop in the Calculating Company. Of this group several were German born. As a result, there was a cleavage of opinion with respect to Hitler and Germany, and many arguments resulted. When defendant was on the stand, under questioning by the court, he freely admitted that he had, in the heat of these arguments, made statements favoring Hitler and his program and also anti-Semitic utterances; he said he was sincerely sorry that he had made such statements. I was impressed by the witness's frankness in this regard. He stated that he had always been loyal to the United States and would bear arms for this country and was most eager to retain his citizenship. The statements made by defendant, in my opinion, do not reflect or indicate a disloyal state of mind in 1932 when he took the oath of citizenship. It must be kept in mind that the statements attributed to defendant were all made at or about the time of Hitler's first aggressions in 1938 and 1939. The defendant came to the United States when he was but nineteen years of age and at that time it can hardly be said, nor is there any evidence to indicate, that he was an advocate of the Hitlerian theories, then in their infancy. Furthermore, at the time he became a citizen he was but twenty-five years of age. He filed his declaration of intention to become a citizen in 1926 very shortly after arriving in this country and at a time when he was only nineteen years of age.

Several witnesses testified as to the good character of the defendant and that they had heard no disloyal statements uttered by him. Among these were two reputable

citizens in whose home he resided for a substantial period of time.

At the time of the submission of the cause, defendant's counsel moved to strike from the record in this case all of the testimony taken in the consolidated case with respect to the purposes and objects of the German-American Bund and its predecessor organizations. It is clear that this case should not have been included in the consolidation in the first instance, inasmuch as the defendant was never a member of the German-American Bund or its predecessor organizations nor is there any substantial evidence that he subscribed in any other way to the principles and purposes of these organizations. Consequently the motion to strike is granted.

After submission of the cause, counsel for the government moved to set aside the submission, for the purpose of introducing the testimony of one Helen E. White. Accompanying the motion was an affidavit of the proposed witness, wherein the facts to be testified to by her, were set forth. The proposed testimony was cumulative in character and would not change my view of the case. Consequently the motion to set aside the submission is denied.

Judgment for defendant.

Gottfried Karl Hein, No. 22419.

■ The government's complaint to revoke naturalization of this defendant was filed December 30, 1942. The complaint and summons were served on the defendant on February 12, 1943, in San Francisco, California. Thereafter the defendant was indicted by the Grand Jury of this District for violation of the Selective Training and Service Act, 50 U.S.C.A. Appendix, § 301 et seq., and, after conviction, was sentenced by Judge St. Sure to serve five years in Federal Prison. Thereafter the defendant was committed to the United States Penitentiary at McNeil, Washington, and is there now serving his sentence.

On August 2, 1943, plaintiff made application to enter the default of the defendant for failure to answer the complaint, and, on said day, the default of the defendant was duly entered. 54 Stat. 1180, 50 U.S.C.A.Appendix, § 520. Thereafter the case was set for hearing, and, upon application of the government, the court issued a writ of habeas corpus ad testificandum, and, pursuant thereto, the defendant was produced at the time and place of hearing and the court proceeded to hear evidence pursuant to the provisions of Subd. (b) (2) of Rule 55 of the Rules of Civil Procedure. Defendant was present in person, heard the testimony produced by the government, made a statement as to his position, produced no testimony on his own behalf and refused to answer any questions when called to the witness stand for cross examination by the plaintiff under Rule 43 of the Rules of Civil Procedure.

The court fully advised the defendant of the nature of the proceedings and afforded him an opportunity to examine or cross examine the witnesses but defendant refused to do aught, but make a brief statement, which is included in the record, and which was of no assistance to the court in determining the issue of denaturalization.

Hein filed his declaration of intention to become a citizen in this court on September 28, 1926, at which time he was twenty-one years of age and by occupation a waiter. His declaration of intention shows that he was born in Nurnberg, Germany, on September 27, 1904, and that he arrived in the United States on or about August 6, 1925. His petition for citizenship was filed November 1, 1932, and he took the oath on March 6, 1933, in this Court. At that time he was of the age of twenty-eight years. At or about the time that he took the oath of allegiance, the evidence shows that he was already attending meetings of the "Friends of the New Germany" and making speeches at meetings of that organization extolling the virtues of Hitler and the New Germany. In the year 1933, the same year in which he was naturalized, the defendant was already extremely active in the work of the organization.

The record is replete with evidence of continuous activity on the part of the defendant from 1933 to 1940 in the affairs of the "Friends of the New Germany" and the German-American Bund. There is evidence of frequent speeches of the defendant and letters written by him, which, beyond question prove that his true allegiance was at all times to Germany and to Hitler and that his oath of fealty to the United States was false and a sham.

Defendant was Ortsgruppenleiter of the Oakland unit of the Bund and he was the leading spirit in the organization of the Concord unit. He was in communication, more or less regularly, with the National Bundesfuhrer, Fritz Kuhn, and with

Schwinn, the Gauleiter of the western district; he read and urged obedience to the Bund Commands, sent from National headquarters, attended conventions of the Bund, and was, generally speaking, the local leader or "Fuhrer" in the San Francisco-Oakland and nearby areas. He frequently made speeches in favor of National Socialism and urged its adoption in this country. There were many anti-Semitic utterances on his part. He consistently referred to Germany as "our Fatherland" and to Hitler as "our Fuhrer;" "Someday we shall show these damn fool Americans how to run this country," was one of his statements. He advocated the consolidation of all German-American organizations in the United States under the leadership of the Bund. It further appeared from the evidence that he received propaganda material of the National Socialist Party of Germany, from German steamers arriving at San Francisco and distributed this literature among members of the Bund. He collected funds for the defense of Fritz Kuhn. In 1936 he visited Germany and conferred with officials of the German Foreign propaganda organization, particularly with Ernst Bohle, the Gauleiter of the Auslandsorganisation, at Stuttgart. He reported back to his associates in San Francisco and elsewhere with respect to this meeting and advised them of plans that had been made there regarding the furtherance of National Socialism in the United States. He took a leading part in celebrations of Hitler's birthday and the Munich "putsch."

The following excerpt from one of defendant's letters offered in evidence is illustrative of his state of mind: "Since the rise of Adolph Hitler I became a fanatic Germanophile and believe that a white man has no right to accept oriental believes or worse to retire on an island in seclusion * * * I believe * * * that the German race, the German people of whom I am proud to say to be descendant since about a hundred generations, are the chosen people of this universe * * * and they have given to this world nine tenth of all the science, culture and ethics."

There is no doubt whatever that the defendant Hein procured his citizenship unlawfully; he never had any other allegiance except to Germany and to the form of government sponsored by the National Socialist party there.

Judgment for plaintiff in this case.

Johannes Frederick Bechtel, No. 22411.

Defendant was born in Vogelsdorf, Germany, on May 24, 1900. In Germany, he received eight years of common schooling and occupational training in gardening for four years; he was in military service in Germany for five months, serving as an infantryman in 1918. In 1920, defendant left Germany for Sweden, where he worked as a gardener, remaining there for five years; he did not become a Swedish citizen. He left Sweden in 1925 and in that year came to the United States on an immigration visa issued by the American Consul at Stockholm, Sweden. His port of entry was San Francisco and he has lived in this area ever since, until excluded by army order. In 1928 he married Margaret Bechtel, a German woman, who had come to the United States in 1923. One daughter is the issue of this marriage, and she was at the date of the institution of this proceeding, approximately thirteen years of age. During his residence in the United States, defendant has been a gardener. After coming to the United States he had some further education in night school. His declaration of intention to become a citizen was filed on April 29, 1927; petition for naturalization was filed November 22, 1933 and he was admitted in the State Court in Oakland, California, on February 23, 1934.

At the time of his admission to citizenship, on February 23, 1934, both he and the two necessary witnesses were examined preliminarily by the Immigration authorities and were again examined by the court, after which the oath was administered by the state judge. Sometime during 1934 he became acquainted with the activities of the "Friends of the New Germany" and he joined the Oakland unit about September 1934. He had a meeting with Gottfreid Hein in August of 1934 and discussed with him the work of the "Friends of the New Germany" and gave his application for membership to Hein. He was a member of the uniformed group, both of the "Friends of the New Germany" and subsequently in the German-American Bund. He attended meetings of both organizations regularly, and wore the uniform of the O. D. He testified that he quarreled with Hein early in the year 1939 and told Hein that he was through with the organization. No written resignation was filed. He knew that Jews were not

82

admitted to the "Friends of the New Germany" or to the Bund; he knew that the Bund and its predecessor organizations were based on the "leadership principle"; he heard speeches by Fritz Kuehn and Schwinn; attended the Dublin Canyon picnic in June 1938 and was mentioned in an article in "Weckruf und Beobachter" as having been the man in charge of keeping the swastika fire burning at that affair. He was one of those present at the organization of the Concord unit of the Bund in 1936.

One witness testified that he saw the defendant at meetings of the "Friends of the New Germany" in the latter part of 1933. There was evidence also that he attended certain of the Bund "forums." He admitted that in 1939 at a time when the Bund was under investigation by the Department of Justice he burned his O. D. cap, belt and other insignia. There is no doubt that this defendant was active in the affairs of the "Friends of the New Germany" and of the Bund and was somewhat well acquainted with the leaders of the organization. His wedding anniversary occurred at or about the time of Hitler's birthday, and was celebrated at his home where there was a prominent display of the swastika flag and emblem. The hat check attendant at the German Pioneer house in Oakland, where meetings of the organization were held, testified that she saw the defendant frequently in O. D. uniform and saw him carry the swastika flag at one of the meetings. One witness testified that in 1935 defendant stated to him that the invasion of Poland by Germany was justified. Another witness testified that defendant had stated to him, in or about the years 1938–1939 that defendant planned to liquidate his property and return to Germany. Another witness, in whose custody defendant left his daughter, when attending meetings of the Bund, stated that the defendant had said to her that he was for Hitler; that Hitler's treatment of the Jews was correct and that the same thing should be done in America and further that he was saving his money to go back to Germany and whether he remained there or not, if he did return, would depend upon what he found there to do.

Henry Koenig was produced as a witness by the government and when questioned concerning statements made to him by the defendant, proved to be an unwilling witness with a poor memory. I permitted the government to ask the witness leading questions, inasmuch as on January 23, 1943, he had given a written statement to Edward W. Butler, Special Agent of the Bureau of Investigation, in which written statement the witness said: "about 1935 or 1936 Hans (i.e. the defendant) began to talk about the conditions in Germany. He would tell about how much better things were in Germany under the new order there. He complained about poor conditions in the United States and would say that things would be better in the United States if the new order was in the United States. Hans approved of the Nazi program. He thought the proper way to do things was the way they were done in Germany. * * * Hans is very argumentative on most any subject and always wanted to be right. He thought his idea was the only right one."

Another witness, Karl W. Boller, likewise proved to be an unwilling witness when produced by the government. It appeared that he also had given a statement to the same agent of the Bureau of Investigation. Boller was a member of a whist club to which the defendant and his wife belonged. He said that everyone in this so-called whist club "thought that Hans was crazy to talk the way he did; he told him on one or two occasions that he was a fool to talk that way. Hans disliked the Jews and said so several times." It developed in the testimony that shortly before the date of the trial, the defendant had visited both Boller and Koenig and discussed their testimony with them. I am satisfied that as a result of these meetings between the witnesses and the defendant, that the witnesses conveniently forgot some of the matters which had been stated by them in writing to the Bureau of Investigation. From this I feel that I properly drew the inference that the defendant was fearful of the testimony of these witnesses.

Another witness, Mrs. Joseph T. Young, for whom the defendant had worked as a gardener, testified on his behalf, and stated that she had never heard him say anything disloyal to the United States. Nevertheless it developed during the course of her testimony that she had reported him to the Federal Bureau of Investigation and had suggested that the Federal Bureau of Investigation investigate him and "save him from himself," as she put it. She admitted that the defendant was talkative and she

had heard him argue about German-American affairs with one of her neighbors.

From all of the foregoing there is no doubt that the defendant was an active sponsor of Hitler and the Nazi doctrines, over a period reasonably proximate to his acquisition of his citizenship and up to and through the year 1938. That he entertained some fears on his own behalf is evidenced by his destruction of the insignia of the Bund in 1939.

On the other hand, several reputable witnesses testified as to their acquaintance with the defendant and that he appeared to them to be a loyal American citizen and had never given any evidence, as far as they had been able to observe, of disloyalty or lack of allegiance to the United States. Among these witnesses was the Honorable Phil S. Gibson, Chief Justice of the Supreme Court of California. Judge Gibson gave evidence that he had known the defendant from December 1, 1939 until about the first of January 1943, during which period of time, defendant worked at the Judge's home as a gardener. The Judge said that he had worked in the garden with the defendant and had conversed with him from time to time on matters of general interest, and from these conversations the Judge was satisfied that the defendant was then a loyal ⁰American citizen, that what views he had had favorable to Germany were changed after the Russo-German treaty in 1939; that he was not antagonistic to the Jews and believed that the United States should provide a home for persecuted Jews and suggested Alaska as the site of such a haven. All in all the Judge spoke well and favorably of the defendant. I could not help but be. impressed by his estimate of the defendant. It is undoubtedly true that after the defendant burned his bridges in 1939 and his German Bund insignia as well, and disassociated himself from the organization, he had a change of heart and from that time on gave full and complete allegiance to the United States.

The question is: Is the evidence as to what he did and said from 1933 to 1939 clear and convincing as to an absence of allegiance to the United States at the moment of naturalization?

As to the weight of statements and acts of the defendant, subsequent to naturalization, in determining state of mind at the time of taking the oath, all statements and acts, whether favorable or unfavorable to the defendant, must be taken into account. It would be an unjust rule that would exclude the favorable and only include the unfavorable. From all the acts and statements the court must endeavor to resolve the truth.

The conduct of the defendant subsequent to 1939 indicates, at least ostensibly, a frame of mind denoting loyalty to the United States and our way of life. However, it does not evidence a similar state of mind from 1934 to 1939. Rather is it convincing that defendant either changed his mind or pursued a course of conduct to give outward indication of such a change.

I am convinced that defendant did not give true faith and allegiance to the United States at the time of naturalization.

Judgment for plaintiff.

## Karl Theodor Stautz, No. 22492.

Defendant was born in Durlach, Germany, on December 7, 1911, the son of a bookbinder. In 1928, when defendant was seventeen years of age, he came to America with his parents, and residence was established by the family immediately in Oakland, California. The father there continued in the bookbinding business. Defendant had a public school education in Germany and spent some little time in mechanical trades school there and, of course, had no military experience in Germany. He attended night school for a short time in California. He has been the main support of his mother since the death of his father, about six years ago. He remained in California until excluded under army order. Defendant's declaration to become a citizen was filed on August 19, 1931, and at that time he was nineteen years of age. Petition for naturalization was filed July 24, 1936 and citizenship was conferred November 9, 1936 by this court.

In 1933, defendant joined the "Friends of the New Germany." This was at the time the San Francisco local unit of that organization came into existence. He played the violin at social meetings of the organization and wore the uniform of and participated to some extent in the activities of the O. D. The attendance book showed that he attended meetings of the "Friends of the New Germany" from January of 1934 to September 1935, a total of sixteen meetings, and in like manner the record book of the O. D. showed attend-

84

ance from September 1935 to December 1935. He dropped out of the organization in 1936, prior to the change of name to German-American Bund.

This young man's activities in the "Friends of the New Germany" consisted of playing in the orchestra and strutting around in the O. D. uniform, which latter probably had some appeal to him. It does not appear that he had any interest in the Nazi doctrines or that he subscribed to them in any tangible fashion. Hence his membership in the "Friends of the New Germany" and its O. D. without more does not substantially support the allegations of the complaint.

There was evidence that he had constructed a small one room building in the rear of his home, where there was on the wall a picture of Hitler and also that during a few months in 1937 he had embedded a swastika in the entrance way to this small building.

One witness testified that defendant said to him before Pearl Harbor "before I will fight, they will have to courtmartial me. I can go back to Germany and get a good job under Hitler." This witness was not wholly credible, in my opinion. The defendant denied the statement.

The evidence presented by the government is wholly unconvincing in this case.

Judgment will go for the defendant.

### Paul Fix, No. 22577.

██ ██ The defendant, Paul Fix, was born in Haslach, Germany, on January 26, 1905. His father was a farmer and defendant had the equivalent of our high school education in Germany and some mechanical trade school training. He was following the occupation of farmer before leaving Germany. Transportation to America was provided by a sister, who was then a resident of the United States, and he arrived in this country on December 17, 1928. He then proceeded to make his home in San Francisco and has resided in the area of San Francisco Bay ever since. He first worked as a baker for various employers and finally acquired a bake shop of his own in San Francisco. Subsequently he moved to Berkeley, where he acquired a bake shop and later moved to Lafayette, Alameda County, California, where he has been operating a bakery for the past two years. At one time, he made several trips as a baker on a coastwise vessel plying out of the port of San Francisco.

Defendant was married, for the first time, in 1930; his wife died the next year and his two month old child he allowed to be adopted. He married again in 1933 and was divorced in 1939 and married his present and third wife in 1942, after he had been operating a bakery in partnership with her and living in the same house with her for approximately a year or more.

His declaration of intention to become a citizen was filed in this court on June 29, 1929; his petition for citizenship was filed September 27, 1935 and he was admitted to citizenship in this court on January 6, 1936.

Without being a member thereof, defendant attended some meetings of the "Friends of the New Germany" in 1934 and 1935 and some meetings of the German-American Bund in 1936.

In 1937 he made a trip to Germany remaining there about six months. While in Germany he purchased an automobile and travelled extensively. According to his own statement, while in Germany, when occasion demanded, he gave the Nazi up raised arm salute, but instead of saying "Heil Hitler" claimed he said "Drei Liter." He returned to San Francisco in the fall of 1937 and did not formally join the German-American Bund until 1938 and paid dues, according to his contention, for a period of only about three months. He claimed that he disassociated himself from the Bund because "he could not get any satisfaction from Hein (the Ortsgruppenleiter) with respect to the disposition of the money of the organization." He was not an officer of the Bund.

The defendant Jessen testified that he observed Fix giving the Nazi salute at Bund meetings. According to the statement given by the defendant to the Federal Bureau of Investigation he saw the swastika flag displayed at meetings of the Bund and listened to numerous lectures on the merits of National Socialism. According to the foregoing statement, he admitted having read regularly the Bund newspaper "Deutscher Weckruf und Beobachter." He attended the famous picnic at Dublin Canyon in 1938 and in 1939 also attended the Convention of the Gautag West in Los Angeles, driving several other members of the Bund from San Francisco there in his automobile. While at the convention at Los Angeles, he joined the others in a group telegram to Senator Johnson, urging that the United States remain neutral in the European war and received in reply a

telegram from Senator Johnson addressed to him personally.

In 1941 defendant was arrested in San Jose for assault upon his second wife, who subsequently divorced him, and was given two years' probation by the court there. In 1943, he was arrested near Lafayette for disorderly conduct and fined $100.

William C. McClure, who had been employed by the defendant in his bake shop at Lafayette, testified that during the year 1942, the defendant made the following statements, in substance, to him:

"That the bombing of Pearl Harbor by the Japs served this country just right;" that President Roosevelt was a "war monger"; that soldiers who passed the bakery in trucks en route to unknown destinations were "going to condemned row;" that "Germany would win the war and that he would not buy any bonds because they would be worthless;" that "Germany would melt the gold in Fort Knox into marks;" that "he would not give the ————— any scrap rubber;" that "he would go to the guard house before he would serve in the army;" that the "Jews were all ————— and ————— and that the United States should have National Socialism here."

Ethel B. Lally, a witness on behalf of the government, and a California State Humane official, testified that when she berated defendant in Lafayette in the early part of 1943 for shooting a dog, defendant stated "that he would shoot any dog he felt like shooting and that Hitler would take over the United States and then she (i. e. the witness) would be taken care of."

During the period from April to July 1940, defendant was a roomer in a rooming house conducted by one Rose Levick in San Francisco. Mrs. Levick testified and it was not denied that defendant had a German rifle and a 22 caliber rifle and a tear gas gun in his possession at that time. The witness testified to the following statements made to her by the defendant: "That Hitler was going to take over America; that the Germans here and in South America were armed and ready to take over control of the country upon orders from Germany; that then General Mosely would be the dictator here under the directions of Hitler; that that would be good for America and would be good for the defendant; that the defendant would be happy under the German system and that so would the witness; that the Jews would be liquidated here and the German National Socialistic system imposed."

According to the witness, defendant stated with reference to the tear gas gun: "people did not know how to use it, it was a secret of the Germans." The witness further testified that the defendant told her not to tell anyone that he had the guns, and, when he left the premises, he requested her to keep them until he called for them.

The testimony of Mrs. Rose Levick was corroborated by her daughter, Ada, and the latter added that the following statements were made by the defendant at or about the same time:

"That all labor unions would be liquidated here in America when Hitler got here and that Roosevelt was a Jew."

The daughter, Ada Levick, testified that defendant said he kept the tear gas gun, in case someone held him up.

James R. Montgomery, another government witness, a retired United States Army Captain, testified that in conversations he had with the defendant in Lafayette during the year 1942, defendant stated: "If President Roosevelt had kept his big mouth shut the United States would not have been in the war."

Emmett R. Howard, who was a witness upon defendant's petition for citizenship, testified, that after the defendant's return from Germany, defendant stated to him: "that Hitler was doing a good job in Germany, and that we needed him here in America; that we needed a government like National Socialism here and that he did not want any Jewish salesmen calling on him."

On behalf of the defendant, a number of his fellow townsfolk in Lafayette testified. The gist of their testimony was that defendant always conducted himself as a law abiding citizen while operating his bakery in 1942 and 1943; that his reputation was good in the community; that he had made some small contributions to the Red Cross and the war effort by way of presents to the soldiers and the Red Cross.

There is no doubt that after defendant learned that inquiries and investigations were being made concerning him by the Federal Bureau of Investigation, he endeavored to conduct himself as a patriotic American citizen. Subsequent to the filing of the complaint against him, he bought $200 face amount of war bonds.

One of the character witnesses, one Frank Phillip Westfall, who was a very staunch advocate of the defendant, stated that the defendant told him that on his, defendant's, trip to Germany in 1937, he found conditions there very bad for the German people. This was contrary to the statements made by the defendant to the witness Howard and also contrary to the defendant's own testimony. It is indicative of the fact that the defendant was pursuing a course of setting himself right with his fellow townsmen during the period of his residence in Lafayette.

Defendant, on the witness stand on his own behalf, admitted that he purchased the German rifle in Germany during his 1937 visit but made no mention as to where or why he had purchased the tear gas gun. He specifically denied statements made by the witness Montgomery. No specific denial was made by the defendant of the testimony of the witness Howard or the witnesses Levick. Defendant went into much detail as to conversations with the witness Lally and contended that this witness was prejudiced and spiteful toward him, but, strangely, did not unequivocally deny the specific statements of the witness Lally as to defendant's reference to Hitler.

Defendant was uncooperative and evasive on the witness stand; he was argumentative and evaded answering questions, both of the court and counsel; he appeared to me to be fearful of making direct responses to simple questions.

There is no doubt, and I am convinced by the evidence, that upon defendant's return from Germany in 1937 he was firmly indoctrinated with the Nazi philosophy and that he was prepared to act as a "storm trouper" in America when the signal was given. In 1942 and 1943, when the likelihood of any Hitler invasion of America became more and more remote, then defendant obviously realized his danger and proceeded to hold himself out as a loyal and patriotic American citizen.

The question in this case is whether or not allegiance to Hitler and Germany was latent in defendant's mind in 1936 at the time he took the oath of allegiance to the United States or whether he became suddenly inoculated with the Nazi virus during his visit to Germany in 1937. Of course, if his allegiance to the United States in 1936 was unequivocal, then, even though he subsequently as a result of his visit to Germany in 1937, turned Hitlerite, he cannot

be denaturalized. If on the other hand the evidence clearly shows a mental reservation as to allegiance in 1936, he should be denaturalized.

It does not necessarily follow that, because the disloyal statements of defendant post dated the visit to Germany, the state of mind which gave forth the utterances, had its genesis during the sojourn in Germany. It is just as reasonable, if not more so, that in Germany he crystalized in more potent form, previously existing thoughts and beliefs. United States v. Schlotfeldt, 7 Cir., 136 F.2d 935.

Defendant is not a particularly intelligent person. He was and is by no means a philosopher in the intellectual sense. The statements, mirrowing his beliefs, were crude. But a stupid alien may be just as fraudulent in the acquisition of citizenship, as a profound thinker.

I am convinced that this defendant should be denaturalized and judgment will go accordingly.

Frank Joseph Andermahr, No. 22426
and Louise Andermahr, No.
22553.

 The defendants are husband and wife and the two cases were consolidated for trial.

Frank Joseph Andermahr was born in Rheydt, Germany, on February 21, 1892. Louise Andermahr was born in Derschlag, Germany, on May 13, 1891. The parties were married in Rheydt, Germany, on August 22, 1921.

Louise Andermahr arrived in the United States on April 14, 1925. Frank Joseph Andermahr arrived in the United States on July 3, 1925 and then joined his wife in California, where she was already residing.

Declaration of intention to become a citizen was filed by Louise Andermahr on February 10, 1937; her petition for naturalization was filed on January 16, 1940 and certificate of citizenship was issued April 22, 1940. Declaration of intention to become a citizen was filed by Frank Joseph Andermahr on October 18, 1937; petition for naturalization, on April 12, 1940 and certificate of citizenship was issued July 15, 1940. Both husband and wife had filed prior declarations of intention, which had lapsed through passage of time.

From 1925 to on or about August of 1942, defendants conducted a boarding house in

San Francisco. Frank Joseph Andermahr made a return trip to Germany in March of 1933 and again visited Germany in 1935. He testified that the object of his first visit was to see his mother, who died the next year (1934). The trip in 1935, he stated, was for the purpose of settling up some business matters with his father.

Both defendants disclaimed membership in the "Friends of the New Germany" or the "German-American Bund." Both testified that neither were present at any business meetings of either organization but only attended social meetings. They stated that they only went to the social meetings after 9 o'clock at night, when they had finished their work in the boarding-house, and, then only to solicit business therefor. Both denied hearing any speeches or lectures on the subject of National Socialism. However the attendance book of the "Friends of the New Germany (Plaintiff's Ex. No. 351) shows that Louise Andermahr attended meetings regularly from February, 1934 to June 1935. The same record shows attendance by Frank Joseph Andermahr from January 1934 to July 1935. The cash journal (Ex. No. 354) shows payment of dues by both defendants under date of December 30, 1933.

Both defendants and several of the other defendants insist that the meetings of the "Friends of the New Germany" and the German-American Bund were social in character and that both organizations only had a social or convivial purpose. However, it is pertinent to remark that there were in existence in San Francisco and vicinity, at the time, a number of old time social and fraternal German organizations of a purely harmless character.

Olga Marie Lucht, who was a witness at the consolidated hearing, testified in this case that she saw both defendants at every regular weekly meeting of the "Friends of the New Germany" at which she was present and that Frank Joseph Andermahr was the "recruiting leader" or "Werbeleiter" of the organization, i. e. it was his official duty to obtain new members. The witness stated that upon the occasion of Frank Joseph Andermahr's second trip to Germany, Louise Andermahr said that she was getting ready to join her husband there and was purchasing furniture here to equip a home in Germany. The witness further testified that at a lecture given at Dreamland Skating Rink in San Francisco, a speaker, who was relating his experiences in Germany, criticized the Nazis for their mistreatment of the Jews, whereupon the defendant Frank Joseph Andermahr arose in his seat and announced that the speaker was not correct; thereupon the defendant was asked to leave the hall and was escorted out of the meeting.

Carl W. Pohlmann, who boarded at the defendants' boarding-house from 1930 to 1942 testified that he saw Herman Schwinn, the Gauleiter of the Bund of Los Angeles, eating meals at the boarding-house in 1933 or 1934.

Claire Toklas, who rented the boarding house premises to the defendants and who lived across the street from the boarding-house, testified that the defendant Frank Joseph Andermahr stated to her at or about the time of the German invasion of Poland, that he was very happy that Hitler had been able to take Poland and Czechoslovakia in two weeks and that Germany was smart and that Hitler would take this country in two weeks.

Henry Landmann, a boarder at defendants' boarding-house during the years 1938 and 1939, testified in substance as follows:

That Frank Joseph Andermahr told him early in 1938 that the boarding-house was registered with the German Consul in San Francisco for the purpose of receiving German guests; that both defendants told him that defendant Frank Joseph Andermahr had previously made a trip to Germany because they both intended to reside in Germany; that Mrs. Andermahr stated in 1941 (when the witness visited defendants) that she and her husband took out citizenship papers in order to protect themselves; that in several conversations between January and June of 1939, both defendants stated that they liked the National Socialist form of government as practiced under Hitler, and when the witness mentioned that in the department store, in which he was employed, one morning fifteen windows were broken, Frank Joseph Andermahr stated: "it could all be blamed onto little Hitler, if the big one (i. e. Adolph Hitler) knew about this it would all be stopped."

By deposition, James Orville Kibby, a law student, who boarded with defendants, testified as follows:

That between August 1940 and December 1940, many discussions were had between the witness and other law student boarders on the one hand and the defend-

ants on the other, concerning the war in Europe; that the defendant Frank Joseph Andermahr stated that Germany would conquer her enemies in a short time; that Poland had really desired to become German and so did Holland and Belgium; that better meals were served when German successes on the battle field were reported and that the defendant Frank Joseph Andermahr stated that he would always serve unusually good meals on the occasion of German victories. Frank Joseph Andermahr further stated that it would be unwise for America to enter the war; that he hated to see the American boys register for selective service; that America should not enter the war because Germany would eventually win. The witness testified that Mrs. Andermahr made substantially the same statements. About once a month, for a period of several days there would be a number of German boarders, both men and women, recent arrivals from Germany who came in vessels calling at the port of San Francisco. Frank Joseph Andermahr frequently referred to Hitler as being a wonderful leader.

Also by deposition, Edith Swan, a daughter of Louise Andermahr's sister, testified that from January 1934 to December 1942, she lived across the street from the defendants' boarding-house and frequently saw and conversed with her aunt and uncle. The witness at the time of the taking of her deposition was the wife of an officer of the United States Army. In substance she testified to conversations with both defendants, from the time of the commencement of the European war to 1941, in which the following statements were made by each of the defendants at one time or another:

That Hitler was good and had done a lot for Germany and that he ought to be over here and could do a lot here; that Hitler would come over here and take over here and would change everything and therefore America should not get into the war at all; that America should not resist; that Frank Joseph Andermahr had gone to the Federal Bureau of Investigation and denied being a member of the Bund and denied knowing any members of the Bund; that at that time he passed the leader of the Bund going into the F. B. I. and pretended that he did not know him so that the F. B. I. would not know of his acquaintance with the Bund leader, if he (the defendant) were under surveillance at the

time; that the Bund was a wonderful organization; that all Germans in the United States should help out Germany and stick together; that Mrs. Andermahr showed the witness a newspaper from her home town in Germany in which there was an article praising the defendants for helping the exchange students working on behalf of Germany in America; both defendants stated that their work here would help them out when they got back to Germany and that they intended to go back to Germany; they both stated they became American citizens so that Hitler could not take their property; that Hitler was going to take over in South America and it would be easy to get into the United States. Defendants entertained the exchange students from Germany who were sent to them by the San Francisco German Consulate. The witness further testified that she attended a meeting of the "Friends of the New Germany" with the defendants; that there were men in the uniform of the O. D. at the meeting; that there were swastika flags all over the place and pictures of Hitler; that the members saluted Hitler and said "Heil Hitler;" that defendants gave the salute and that defendants told the witness that both of them were members and that they signed the witness up as a member and paid her initiation fees and one month's dues; that Mrs. Andermahr stated: "we have to get a lot of members so we can help Germany;" that Mrs. Andermahr urged the witness to get up and Heil Hitler at the meeting. It was further stated by the witness that the defendant Frank Joseph Andermahr requested her, after he had seen the F.B.I., not to disclose the names of any of the members of the "Friends of the New Germany;" that Frank Andermahr further stated, after acquiring citizenship that now that he was an American citizen, "they can't pin anything on me now I am an American citizen. I will get the best attorney in the United States." The statements about Hitler taking over in America were made after defendants had become American citizens.

Mrs. Andermahr denied some of the statements of the witnesses Swan and Kibby. Frank Joseph Andermahr denied some of the statements of the witness Mrs. Toklas. Mrs. Andermahr admitted that she had signed the attendance book of the "Friends of the New Germany" but claimed that she did not attach any significance to such signing on her part, but as-

89

serted that she just signed the book because she was told to sign it.

Mrs. Andermahr claimed that her niece, Edith Swan, testified against defendants because of spite, but failed to explain further.

While the court obviously did not have the opportunity of appraising the witness Swan personally, yet no reason appears to disbelieve her.

I am convinced by the evidence that the defendants Andermahr never in fact renounced their allegiance to Germany and that they were devoted, prior to and at the time of naturalization, to the cause of Germany and Hitler.

Judgment will go for plaintiff in both cases.

Judgment may therefore be entered in favor of the plaintiff and against the defendants Frank Joseph Andermahr, Louise Andermahr, Johannes Frederick Bechtel, Paul Fix, Gottfried Karl Hein, Andreas Peter Jessen, and Friedrich Wilhelm Kuehn, and in favor of defendants Fred Bernard Christophel, Otto Fuerst, Herbert Landes, Kurt Max Frederick Nitz, and Karl Theodor Stautz.

Separate findings and judgments may be submitted by the prevailing party in each case within twenty days and opposing counsel may have ten days thereafter within which to submit objections or amendments.